## Maloney et al. v. Bedford.

May 15, 1942.

648

Marcus Redwine and Rodney Haggard for appellants.

Jouett & Metcalf, Harvey T. Lisle and Emmett Whipple for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

The appellee, Viola Bedford, instituted this action to enjoin appellants, Fred Maloney and wife, from obstructing or closing up a passway extending from appellee's east line through appellants' land to the Paris-Winchester Pike. On motion of appellants the action was transferred to the common law docket for the trial of legal issues. Two trials were had, both resulting in hung juries. On motion of appellants the action was then transferred to the equity docket for trial by the chancellor upon the evidence produced at the second jury trial. The chancellor enjoined appellants from interfering with appellee's use of the passway and from that judgment this appeal is prosecuted.

Appellants' farm, containing approximately 69 acres, lies on the west side of the Winchester-Paris Pike, and appellee's farm, containing approximately 328 acres, lies west and north of appellants' farm, having approximately the same frontage on the turnpike as appellants' 69 acres. Appellants purchased their land in the year 1939 at a time when the passway in controversy was well marked as a roadway. Appellee acquired title from her husband, who obtained possession of the 328 acres in the year 1880, though he did not obtain deed therefor until some years later. The passway in controversy was in existence before •the construction of turnpikes in the county and ran in an east-west direction entirely through both farms, emerging on the west side of appellee's farm into the farm of Tom H. Clay, from whence it went on to Austerlitz Station. The brick residence on appellee's farm was built in the year 1803 and there seems to be little doubt that the passway continued to be used from

that time until the present. However, when turnpikes were constructed in the county, one was constructed north of appellee's farm, so that the necessity for public use of the old passway ceased.

In the year 1908, after the use of the passway by the public had ceased, Tom H. Clay erected a stone wall across it where it entered his land, thereby practically preventing any public use of it, although there is some evidence that he left a gate near the stone wall by which occasional use was made of the passway. After the stone wall was erected however, Mat Bedford, appellee's husband, continued to use the passway from his residence and from other portions of his farm in getting to the Paris-Winchester Pike.

There can be little doubt that the original passway was a public one and that appellee's predecessors in title had acquired a prescriptive right to the use thereof. In fact, it is conceded in appellants' brief that soon after 1860 there was a passway, used by people residing in the vicinity, running through appellants' and appellee's farms to the store, post-office and railroad station at Austerlitz and that this use continued for many years and until turnpikes began to be built. However, appellants pleaded that since the year 1919 and for more than 15 years next before the commencement of this action the use of the passway through their farm was by express permission of the owners of the farm and not as an assertion or claim of right. To substantiate this plea a number of witnesses testified for appellants to conversations between Mat Bedford and appellants' predecessors in title, for the purpose of establishing that use of the passway in later years was a permissive use. This testimony will be considered later in detail.

At the outset it may be said that there is considerable doubt that appellants' pleading as to permissive use of the passway in later years was sufficient to constitute a defense. As indicated above, there is little, if any, doubt that appellee's predecessors in title had acquired the right to use the passway by prescription. Having done so, this title acquired by adverse possession was equivalent to a title derived by deed and could be lost or divested only in the same manner—mere recognition of title in another, after acquisition by adverse possession, will not operate to divest the adverse claimant of that which he has acquired. 2 C. J. S., Adverse Pos-

session, Section 208, p. 807; 1 A. J. 885. Further, a title acquired by adverse possession is not lost by admissions to, or agreements with, the old owner that such holding was not adverse. 2 C. J. S., Adverse Possession, Section 208, p. 807; Robertson v. Chesapeake & O. Railway Co., 213 Ky. 1, 280 S. W. 452. In the latter case it was pointed out that evidence of permissive user or recognition of title in the former owner, after title is acquired by adverse possession, is not sufficient to defeat the title already acquired but is merely evidence to be considered in determining whether the prior possession was in fact adverse. Similarly, it is said in 28 C. J. S., Easements, Section 61, p. 728, "An easement acquired by adverse user will not be defeated by obtaining a license for its further enjoyment, although the application for such license is evidence that the former use was not adverse but permissive." Thus, appellee and her predecessors in title having acquired by adverse user a right to the passway, evidence of permissive user thereafter would not operate to defeat the title already acquired.

But, aside from this, we have given careful consideration to the evidence introduced by appellants and in our opinion it was insufficient to justify a finding that the use of the passway in later years was strictly permissive. Two of the witnesses, Joe Jones and J. P. Williams, testifying to a conversation between Mat Bedford and Lewis Flynn, who became the owner of appellants' land in 1901, stated, in substance, that Bedford said to Flynn that the passway was not a deeded passway but a *free* passway and further said, "If it was closed at one end it could be closed all the way through but it was used as a *free* passway." G. W. Cole, who acquired the land from Flynn in 1919, testified that Bedford, upon learning that he was proposing to close the road, said he had used the road a long time and would like to come out that way and would take good care and keep the gates closed if Cole would permit him to do so. J. S. Talbee, who became the owner of appellants' land in 1930, testified that Bedford said that he had been using the passway there and would like to continue to use it and that he told Bedford that it would be alright if he would give no trouble and that Bedford replied, "If my men give you any trouble down there I will put them out." Clifford Talbee, son of J. S., testified to the same effect. P. E. Norton testified that he heard Bedford say

he didn't have any passway and always got permission from the one who owned it, but on cross examination stated that Bedford said he had no *deeded* passway. Mack McKenzie and his son, Sam, furnished probably the strongest testimony as to the original use of the passway being permissive. They testified that in conversation with M. H. Wheeler, who acquired title to appellants' land in 1920, Bedford stated that "he had been going through there by permission and would like to continue to go through." However, we are inclined to the view that these two witnesses heard the same character of conversation as the others and placed their own construction thereon. A careful consideration of this testimony convinces us that in each of his conversations with former owners of appellants' land Mat Bedford was trying merely to avoid controversy or litigation over his use of the passway and did not admit, or intend to admit, that he had no right to use it. His statement that if the passway was closed at one end it could be closed at the other, if made, was merely the statement of an erroneous legal conclusion. In some of these conversations Bedford stated that he had no deeded passway—such statements are rather indicative that he had in mind his right to a passway acquired by prescription. Further, it does not appear that any vendor of appellants' land ever disclosed to his vendee the important fact that Bedford acknowledged that his use of the passway was permissive. Each of these purchasers bought the land at a time when the passway was an open and visible one and the existence of the passway necessarily had an important bearing on the sale of the farm. In these circumstances there is no rational explanation why alleged admissions of permissive user, if made by Bedford to the various users, were not repeated to the vendees, or at least to some of them. Had admissions of permissive user been made by Bedford to the various purchasers and repeated by each of his vendee, such vendees would no doubt have inquired of Bedford as to the character of his user before purchase. This was never done. It is our conclusion that the evidence shows merely that Bedford, in these conversations, was trying to avoid litigation or controversy over his use of the passway and to keep it open by peaceable means, but that in any event, such conversations or admissions were insufficient to divest him of the right to use the passway acquired by adverse possession many years prior thereto.

652

It is contended by appellants that the petition failed to state a cause of action and a number of minor irregularities are assigned. We are of the opinion that all of these are without merit. The petition alleged that for more than 15 years next the appellee had been using the passway over the land owned by the appellants under a claim of right and that such use had been open, continuous and notorious and that the appellants were preventing the use of the road by erection of barriers. This was sufficient. Nor is the judgment erroneous in describing the passway as being 1,960 feet in length when the proof shows that it is only approximately 1,060 feet. This was evidently a typographical error. In any event, the judgment describes the passway as the one now in existence across appellants' land and the length is immaterial.

We are earnestly urged by appellants to pass on the correctness of the instructions given to the jury on the two trials which resulted in hung juries but we have no concern with the correctness or incorrectness of those instructions. When the case was submitted to the chancellor on appellants' motion, the correctness or incorrectness of those instructions became immaterial and the only question confronting us is whether the judgment rendered by the chancellor was correct. As indicated above, we have determined that it was.

Judgment affirmed. The whole court sitting.